# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

ROY H. MCLAUGHLIN, JR.                                  CIVIL ACTION
(DOC# 399370)

VERSUS

BURL CAIN, ET AL                                        NO. 08-78-B-M2

## NOTICE

        Please take notice that the attached Magistrate Judge's Report has been filed with
the Clerk of the United States District Court.

        In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service
of this Notice to file written objections to the proposed findings of fact and conclusions of
law set forth in the Magistrate Judge's Report.  The failure of a party to file written
objections to the proposed findings, conclusions, and recommendation contained in a
Magistrate Judge's Report and Recommendation within 10 days after being served with a
copy of the Report shall bar that party, except upon grounds of plain error, from attacking
on appeal the unobjected-to proposed factual findings and legal conclusions of the
Magistrate Judge that have been accepted by the District Court.

        **ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE
WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

        Signed in chambers in Baton Rouge, Louisiana, March 9, 2009.

                                        _____
                                        **MAGISTRATE JUDGE CHRISTINE NOLAND**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**ROY H. MCLAUGHLIN, JR.**                              **CIVIL ACTION**
**(DOC# 399370)**

**VERSUS**

**BURL CAIN, ET AL**                                        **NO. 08-78-B-M2**

## MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the Petition for Writ of Habeas Corpus (R. Doc. 1) filed by petitioner, Roy H. McLaughlin, Jr. ("petitioner"). The State has filed an opposition (R. Doc. 14) to McLaughlin's petition.

## PROCEDURAL BACKGROUND

On August 23, 1999, petitioner was charged by indictment with the second degree murder of his wife, Marianne McLaughlin ("Mrs. McLaughlin"), in violation of La. R.S. 14:30.1. Prior to trial, petitioner filed various motions, including a motion to recuse the trial judge, a motion to suppress statements and confessions, and a motion to quash the indictment based upon improper venue, all of which were denied by the trial court. Petitioner subsequently pled not guilty to the second degree murder charge, and following a seven-day jury trial in March 2001, he was convicted on that charge. Petitioner was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. He filed a motion for post-verdict judgment of acquittal, or alternatively, for a new trial, which was denied by the trial court.

Petitioner appealed his conviction and sentence to the Louisiana First Circuit Court of Appeals, alleging in his appeal that the evidence presented at trial was insufficient to support his second degree murder conviction. The First Circuit affirmed his conviction and

sentence on March 28, 2002.  Petitioner also filed a writ application with the Louisiana Supreme Court on direct appeal, which was denied on May 16, 2003.

On August 18, 2003, petitioner filed a post-conviction relief application with the state trial court.  In that application, he raised the following issues:  (1) that his indictment should have been quashed and that his due process rights were violated because he "stood trial on an indictment which the prosecuting attorney knew was based on perjured testimony and when the perjured testimony was material;" and (2) that he received ineffective assistance of counsel in two ways:  (a) as a result of defense counsel's failure to contemporaneously object and file a motion to quash the indictment on the ground that it was obtained through the use of perjured testimony, and (b) as a result of defense counsel's failure to investigate the case, cross-examine witnesses, and call witnesses to testify.  The state trial court denied petitioner's post-conviction relief application on the ground that the first claim raised therein was procedurally barred and the second claim lacked merit.  Petitioner applied for writs to the First Circuit Court of Appeals and the Louisiana Supreme Court relative to the denial of his post-conviction relief application, and those writ applications were denied on March 7, 2007 and January 7, 2008 respectively.

Petitioner then filed the present habeas petition on or about February 11, 2008.  In his habeas petition, he asserts the following claims:  (1) that the evidence presented at his trial was insufficient to prove the essential elements of the crime of second degree murder; (2) that his right to due process was violated, and his indictment should have been quashed because he "stood trial on an indictment which the prosecutor knew was based on perjured testimony and when the perjured testimony was material;" and (3) that he received ineffective assistance of counsel (a) due to his trial counsel's failure to contemporaneously

object and file a motion to quash the indictment on the basis that it was obtained through the use of perjured testimony, and (b) due to his trial counsel's failure to investigate the case adequately, cross-examine witnesses, and call witnesses to testify.   The State concedes in its opposition filed herein that petitioner's habeas application is timely-filed and that petitioner exhausted his state court remedies relative to all of the claims asserted in the application.   Accordingly, the Court will now consider the merits of petitioner's claims in this report.

## LAW & ANALYSIS

In order for this Court to grant an application for a writ of habeas corpus as to any claim which has been previously adjudicated on the merits in state court, the Court must find that adjudication of such claim:  (1) resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. § 2254(d)(1) and (d)(2).   In addition, determinations of factual issues made by state courts shall be presumed correct, unless particular statutory exceptions to 28 U.S.C. § 2254(d) are implicated, and the applicant has the burden of rebutting that "presumption of correctness" by clear and convincing evidence.   28 U.S.C. § 2254(e)(1); *Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994).   Thus, the presumption of correctness is properly invoked if the petitioner fails to contend that any exceptions to §2254(d) are applicable to his case and if the Court finds that there were no defects in the state court's procedures.   *Id.* at 631.

**I.    Petitioner's claim that his due process rights were violated because his indictment was not quashed:**

As discussed above, this claim was presented to the state trial court in petitioner's post-conviction relief application and was denied.  In denying the claim, the trial court's Order stated the following:

> As to defendant's claim that the grand jury indictment was defective, it is DENIED.  La. C.Cr.P. art. 535 requires that a motion to quash be filed before the commencement of trial.  By definition, this Application for Post Conviction Relief is filed after trial.    Further, La. C.Cr.P. art. 930.4 states that, if defendant know[s] of a defect and fail[s] to raise it on appeal, it may be denied.  Defendant appealed this case to the First Circuit Court of Appeal (which affirmed on April 2, 2002) and did not raise this claim.  Therefore, this claim has been waived.

*See*, State trial court's December 7, 2006 Order, denying petitioner's Post-Conviction Relief Application.  Subsequently, the First Circuit Court of Appeals and the Louisiana Supreme Court summarily denied writ applications addressing this claim.  Accordingly, the last state court to address the merits of this claim, the state trial court, expressly denied it on the procedural bases of La. C.Cr.P. arts. 535 and 930.4.

It is well-established that a federal court reviewing a state prisoner's habeas claim must respect a state court's determination that the claim is procedurally barred under state law.  *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 2508-09, 53 L.Ed.2d 594 (1977).  Where the last state court addressing a claim has clearly and expressly stated that its judgment rests upon a state procedural bar, as occurred in this case in the state trial court, the petitioner has procedurally defaulted that claim, and this Court may not consider it upon

habeas review.[1]   Furthermore, at least one of the procedural grounds for the state trial court's decision in this case, La.C.Cr.P. art. 930.4, has been specifically recognized as an "independent and adequate state ground" for rejecting a claim for post-conviction relief. *Desalvo v. Cain*, 2002 WL 1585564 (E.D. La. 2002).  "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an "independent and adequate" state procedural rule, federal habeas review of such claims is barred unless the prisoner can demonstrate cause and prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).  Petitioner has failed to set forth any argument or evidence demonstrating that any of those factors exist in the present matter.  Accordingly, this claim should be dismissed with prejudice as procedurally defaulted.

## II.    Insufficiency of the Evidence claim:

The critical inquiry for review of a sufficiency of the evidence claim upon federal habeas review is to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt, and the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  When circumstantial evidence is used to prove the commission of a crime, La. R.S. 15:438 requires that,

---

[1] *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997)(A state procedural rule enjoys a presumption of adequacy when the state court expressly relies on it in deciding not to review a claim for collateral relief).

"assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  La. R.S. 15:438; *State v. Rosiere,* 488 So.2d 965, 968 (La. 1986).  All evidence, both direct and circumstantial, must be sufficient under the *Jackson* standard to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.  *Id.*

In the present case, petitioner was charged with second degree murder, and the issue relative to this claim is therefore whether any rational trier of fact could have found that the State proved the essential elements of that crime beyond a reasonable doubt.  The crime of second degree murder is defined in La. R.S. 14:30.1, in pertinent part, as the "killing of a human being . . . [w]hen the offender has the specific intent to kill or to inflict great bodily harm . . ."  La. R.S 14:30.1.  Thus, to convict a person of second-degree murder, the State has the burden of proving beyond a reasonable doubt:  (1) the commission of a homicide, (2) by the defendant, (3) who personally had the specific intent to kill or inflict great bodily harm.  *State v. Wolfe*, 98-0345 (La. App. 4 Cir. 1999), 738 So.2d 1093, 1098, citing La. R.S. 14:30.1.

"Specific intent" is defined in Louisiana law as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La. R.S. 14:10(1).  Specific intent may be proved by direct evidence, such as statements by the defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances.  *State v. Cummings*, 99-3000 (La. App. 1 Cir. 874), 771 So.2d 874.

In reviewing McLaughlin's conviction on appeal, the First Circuit Court of Appeals found that the evidence presented at trial "overwhelmingly excluded every reasonable

hypothesis of innocence and was sufficient under the *Jackson* standard to convict defendant of second degree murder."  This Court has reviewed the state court record and finds that the First Circuit's conclusion is not unreasonable in light of the evidence presented at trial.  Specifically, the testimony and evidence presented at trial demonstrated that, on May 13, 1998, there was an outstanding warrant for the arrest of petitioner in East Baton Rouge Parish on the felony charge of issuing worthless checks.  Mrs. McLaughlin reported to the East Baton Rouge Parish Sheriff's Office that petitioner was at her home located at 15444 Ferrell Avenue in Baton Rouge and could be apprehended on that charge.  When officers from the Sheriff's Office arrived at Mrs. McLaughlin's house to arrest petitioner, he escaped arrest by fleeing through a bathroom window.  The officers described Mrs. McLaughlin's demeanor, at the time petitioner escaped, as "visibly shaken" and "scared."  On that same day, Mrs. McLaughlin filed for divorce and for a temporary restraining order against petitioner.[2]

Petitioner fled from Louisiana to Boone, North Carolina.  A friend of petitioner's, Floyd Miller ("Miller"), helped petitioner find a job with a commercial debt recovery business in Boone.  After petitioner had worked and lived in Boone in temporary corporate housing for several weeks, he informed Miller on June 10, 1998, just after he received his first paycheck, that he was going to travel to Baton Rouge after work on June 12, 1998 to pick up his vehicle and other personal items.  The evidence indicated, however, that petitioner did not report to work on June 11, 1998, and that, on that date, he rented a 1991 Chevy

---

[2] The divorce petition that Mrs. McLaughlin filed on May 13, 1998, was the second petition for divorce that she had filed since she and petitioner married on December 15, 1979.  The first petition had been voluntarily dismissed by Mrs. McLaughlin and petitioner after they voluntarily reconciled in 1996.

Lumina from Mack Brown's Chevrolet Dealership in Boone.[3]  When he rented the vehicle, petitioner did not advise that he planned to drive the vehicle out of state; instead, he informed the employee who rented the vehicle to him that he had recently moved to the North Carolina area and that he was renting the vehicle so that he could familiarize himself with the area.  The rental was for a four (4) day period.  Petitioner then drove the rental car from Boone, North Carolina, to Baton Rouge, Louisiana, and checked into the Quality Inn on Mead Road near Sherwood Forest Boulevard at approximately 8:56 p.m. on June 11, 1998.  The Quality Inn was located only 4.5 miles from Mrs. McLaughlin's residence on Ferrell Avenue and is the closest motel to that residence.  Upon check-in to the Quality Inn, petitioner gave his correct name, but he provided a false address and vehicle description.[4]

The youngest son of petitioner and Mrs. McLaughlin, John Daniel ("Danny"), who lived with his mother in Baton Rouge, had left home to visit friends at 7:00 p.m. on the night of June 11, 1998.  When he left home, Mrs. McLaughlin was alone at their residence.  Her 1994 Chevrolet Caprice Classic was also present at the residence, and Mrs. McLaughlin had not told Danny that she was going anywhere that evening.  Danny returned home at about 11:30 p.m. that night, at which time both his mother and her vehicle were gone.  Mrs.

---

[3] Petitioner also placed nine (9) telephone calls in a four (4) hour period on the afternoon of June 10, 1998 from his work station in Boone to Mrs. McLaughlin's home and work place in Baton Rouge.

[4] Evidence was also presented at trial demonstrating that, although petitioner made only five (5) calls from Boone, North Carolina, to Baton Rouge between May 18, 1998 and May 31, 1998, in the ten (10) days preceding Mrs. McLaughlin's disappearance (from June 1, 1998 to June 11, 1998), petitioner placed forty (40) calls to Mrs. McLaughlin's residence and/or work place in Baton Rouge, with thirty-one (31) of those calls being placed from petitioner's work station in Boone in a 5.5 hour period on June 5, 1998, six days before Mrs. McLaughlin disappeared.

McLaughlin had, however, uncharacteristically left her pager at home.  Danny contacted his older brother, Trey, who informed Danny that Mrs. McLaughlin had mentioned to him that she planned to meet with petitioner to discuss their marital situation, but he was not sure when that discussion was to occur.[5]  While at home that night, Danny also received a phone call from petitioner, who asked if Mrs. McLaughlin was at home.  Danny told petitioner she was not at home, and petitioner said, "well she must not have gotten back yet," and "she'll be in shortly."  Upon the advice of his brother, Danny spent the night at a friend's house on the night of June 11, 1998, and he went to a basketball camp at his high school the next morning.

On June 12, 1998 at approximately 6:25 a.m., petitioner called the Yellow Cab Company from a payphone on Chippewa Street in Baton Rouge.  Petitioner requested that a cab pick him up from Benny's Car Wash ("Benny's") on Airline Highway and advised that his name was "John."  Petitioner dropped off the rented Chevy Lumina at Benny's at 6:29 a.m.  He then left Benny's in the cab he had requested.  Video surveillance from Benny's confirms petitioner's arrival at the carwash in the rented Lumina and departure in the cab.  The cab driver who picked up petitioner testified that petitioner told him he had just dropped off his wife's car at Benny's to be washed.  Petitioner requested that he be taken to the Quality Inn where he had checked in the previous evening.  Shortly after Benny's opened, at 8:15 a.m., petitioner contacted Benny's and asked that the "Super Clean" service be performed on the Chevy Lumina he had left there.  He also requested that the trunk of the

---

[5] One of Mrs. McLaughlin's co-workers, Pat Badon, also testified that Mrs. McLaughlin had informed her that she was going to meet with her husband concerning the filing of the divorce; however, Ms. Badon was unaware of when that meeting was to occur.

car be vacuumed and indicated he would pay the extra cost of $2.00 to have such service performed. When the Lumina's trunk was cleaned at Benny's, the carpet therein was intact.[6]

Testimony was presented at trial indicating that, at approximately 10:00 a.m. on June 12, 1998, petitioner traveled to Gonzales in Mrs. McLaughlin's car for a haircut. Delores Pylate, a friend of petitioner's who cut his hair that day, testified that she asked petitioner to go visit her fiancé but that petitioner told her he could not do so because he was going on a boat ride with his brother, Kirk McLaughlin. Petitioner's brother, however, testified at trial that he had not spoken to petitioner since the previous Thanksgiving, that they had no plans to take a boat ride on June 12, 1998, and more than likely, he was working that day. Pylate also indicated that, when petitioner left the barber shop, he drove in the direction of Baton Rouge in a Chevy Caprice. According to the Quality Inn's records, petitioner checked out of that motel at 12:28 p.m. on June 12, 1998.

At some time around noon on June 12, 1998, petitioner called Mrs. McLaughlin's home again and spoke with his son, Danny, who had arrived home from his basketball camp. He asked Danny if Mrs. McLaughlin was home yet. Danny told petitioner she was not home, and at that point, petitioner told Danny that Mrs. McLaughlin had gone to Mississippi with a friend to buy a new car because she was giving him her current car, the Caprice Classic. Although petitioner admitted to Danny that he was in Baton Rouge, he would not tell Danny the specific location from which he was calling. Later that day, Trey

---

[6] The Mack Brown employee who rented the Lumina to petitioner also testified that, at the time the vehicle was rented, the trunk was fully lined with carpet, and the carpet was in good condition. He also testified that there was no requirement that rental customers clean the rental vehicle before returning it.

McLaughlin contacted the East Baton Rouge Parish Sheriff's Office when Mrs. McLaughlin did not show up for Danny's baseball game.  Sergeant Steve Young arrived at the Ferrell Avenue residence at approximately 7:30 p.m.  Sergeant Young and Detective Shane Evans searched the home and found no evidence of a physical struggle.  They did find, however, several over-due bills, suggesting that Mrs. McLaughlin was experiencing financial difficulties at the time.  Trey explained to the detectives assigned to the case that his parents had separated a month earlier and that his mother had mentioned to him that she was going to meet with petitioner to discuss a divorce, although she had not specified a date for such meeting.[7]  Trey also related to the detectives the substance of the telephone conversations that his brother had had with petitioner.  A BOLO ("be-on-the-lookout") was then issued for petitioner, Mrs. McLaughlin, and her Caprice Classic.

At approximately 5:00 p.m. on June 12, 1998, petitioner returned to Benny's in Mrs. McLaughlin's Caprice Classic.  He departed from Benny's in the Lumina, leaving Mrs. McLaughlin's Caprice Classic there to be cleaned.

On the morning of June 13, 1998, petitioner called Mrs. McLaughlin's home again and spoke with his son, Trey.  Petitioner asked Trey to pick up Mrs. McLaughlin's car at Benny's because he had left it there to be cleaned.  According to Trey's testimony at trial, petitioner would not tell him where he was located when he called, and petitioner would not answer any questions about Mrs. McLaughlin, other than to say that she had gone to Jackson, Mississippi, to buy a new car.  Trey indicated, however, that such explanation of

---

[7] Trey also testified at trial that his parents' marital situation had been "unhappy," and, in the early part of 1998, he had walked in while his parents were having a verbal fight and overheard his mother say that she wanted a divorce.  Trey testified that he overheard a portion of his father's response, which included the word "kill."

his mother's whereabouts was suspicious because his mother was not in a financial position at the time to purchase a new car.  According to records at the Days Inn in Brandon, Mississippi, petitioner checked into that motel at some point before 11:00 a.m. on June 13, 1998, providing a false name, address, and vehicle description upon check-in.

On June 13, 1998, East Baton Rouge Parish Sheriff's deputies secured Mrs. McLaughlin's Caprice Classic from Benny's.  They obtained a warrant to search the vehicle, and during their search, they found a copy of petitioner's bill from the Quality Inn as well as Mrs. McLaughlin's cell phone and brief case, which contained tax receipts from a Mississippi property listed in the name of petitioner.  A latent fingerprint from petitioner's left middle finger was also lifted from the interior front passenger door window of the Caprice Classic.

After receiving a complaint about petitioner, Brandon City Police Officers obtained a search warrant to search petitioner's room at the Days Inn in Brandon, Mississippi on June 16, 2008.  When petitioner arrived at the Day's Inn in the rented Chevy Lumina, Brandon City Police Lieutenant David Ruth ran a check on the car's license number and found that it was a vehicle rented by petitioner and that petitioner was wanted on an outstanding felony warrant in Louisiana.  Petitioner was then arrested, and the Brandon City police searched his Days Inn motel room.  Their search revealed a partially full box of Tide detergent, a large amount of clothing belonging to petitioner, and a dry cleaning receipt from a dry cleaning business in the area.  The police also searched the rented Lumina and found that the carpet inside of the trunk and portions of the padding under the carpet had been removed, that the spare tire was gone, and that the area of the trunk where the spare tire was stored also contained a considerable amount of soapy water and

some fresh rust.  Police also lifted latent fingerprints from the driver's side rear corner of the trunk lid, which were identified as being those of petitioner.[8]

Petitioner was transported from Brandon, Mississippi, to the East Baton Rouge Parish Sheriff's Office because of the outstanding warrant for his arrest in Louisiana.  Upon transfer, an unendorsed Louisiana state income tax refund check made out to petitioner and Mrs. McLaughlin as well as $721.06 in cash were seized from petitioner.  According to testimony presented at trial, the income tax refund check had been at Mrs. McLaughlin's home, where it was mailed to her in June 1998 while petitioner was living in North Carolina.

Petitioner was subsequently indicted for the murder of Mrs. McLaughlin on August 12, 1999.  On December 27, 1999, human skeletal remains, identified as being those of Mrs. McLaughlin, were discovered by a hunter in a secluded area of the Homochitto National Forest in Mississippi.  A forensic pathologist, Dr. Alfredo Suarez, testified at trial that, although Mrs. McLaughlin's body was significantly decomposed at the time he examined it, the condition of the remains was not inconsistent with someone who had died as a result of strangulation or suffocation.

Evidence presented at trial also indicated that petitioner owned several tracts of land near the remote area of the Homochitto National Forest where Mrs. McLaughlin's skeletal remains were found.  The testimony of one of the co-owners of the property owned by petitioner in that area, William Myrick, indicated that he and petitioner had hunted that area

---

[8] The police also obtained a record of all telephone calls petitioner made from his Days Inn motel room between June 13, 1998 and June 16, 1998.  He placed a total twenty-nine (29) calls to personal escort services, a shopping center, a cleaners, several dentists, a Chevy Dealership, a tax service, and several banks.  However, none of those calls were placed to his sons in Baton Rouge or to his job in Boone, North Carolina.

extensively and that petitioner was quite familiar with the territory.

The State also presented the testimony of one of petitioner's fellow inmates at the East Baton Rouge Parish Prison, James Johnson ("Johnson").  Johnson testified that he had been housed in an adjoining cell to that of petitioner and that, because of the similarities in their cases (*i.e.*, Johnson was in prison on a charge of second degree murder of his fiance), petitioner confessed to him that he killed his wife.  Johnson also testified to various details concerning Mrs. McLaughlin's family history and her marital situation, which he had learned from petitioner.  Information concerning Mrs. McLaughlin's family history was confirmed by her mother at trial.  Johnson testified that he had not learned such information or any other information about petitioner's case from the newspaper because petitioner always removed any reports concerning his case that were in the newspaper before Johnson read it.

According to Johnson's testimony, petitioner admitted that he met with Mrs. McLaughlin at the Quality Inn near Sherwood Forest Boulevard in Baton Rouge on June 11, 1998.  During that meeting, Mrs. McLaughlin informed petitioner that she wanted a divorce.  When she would not agree to reconcile with petitioner, they got into an argument, and petitioner smothered Mrs. McLaughlin with a pillow and cut her body up in the motel bathtub.  Johnson testified that petitioner told him he killed Mrs. McLaughlin because "if he couldn't have her no one else could."  Petitioner also told Johnson that, after the murder, he took his rented car to Benny's and had the vehicle and its trunk cleaned to remove evidence.  Petitioner told Johnson he had committed the "perfect murder" and that the State would never find "where he hid different pieces of [Mrs. McLaughlin's body]."  According to Johnson, petitioner, in explaining the murder, appeared to have "enjoyed"

14

killing Mrs. McLaughlin.  Finally, Johnson testified that, when reports arose that the skeletal remains of Mrs. McLaughlin had been discovered, petitioner yelled, "Oh s–t, I'm f–ed."[9] [10]

In response to the evidence presented by the State, petitioner did not testify on his own behalf.  Although eight (8) witnesses and three (3) exhibits were presented by the defense, no evidence establishing an alibi for petitioner on the dates and times in question was presented.  Furthermore, another of petitioner's fellow inmates at parish prison, Barry Lugar, testified, during the defense's case, that he provided a signed statement to the police indicating that petitioner confessed to him that he killed Mrs. McLaughlin.[11]

The Court finds that the above evidence and testimony[12] were sufficient for a reasonable juror to conclude, beyond a reasonable doubt, that petitioner committed the

---

[9] A map that petitioner allegedly drew while in prison, indicating where he disposed of his wife's body, was also introduced into evidence at trial.  Although the map depicted that petitioner disposed of her body in the Atchafalaya Basin, rather than the Homochitto National Forest, the map nevertheless bore the petitioner's fingerprints and palmprints.

[10] Testimony was also presented at trial indicating that, although petitioner's 15- and 17-year old sons, were without a guardian and without money after Mrs. McLaughlin disappeared and while petitioner was still in Baton Rouge, petitioner never went to their home to take care of them or offer them any money.  He also never coordinated any sort of effort to locate his missing wife and never contacted the McLaughlin residence again to find out if Mrs. McLaughlin had returned home after his June 13, 1998 call to Trey asking him to go pick up Mrs. McLaughlin's car from Benny's.  Testimony further indicated that petitioner never returned to his job in Boone, North Carolina, and never contacted his friend who helped him obtain that job or his place of employment to advise that he was not returning.  When his temporary corporate housing in Boone was searched, all of petitioner's belongings, except a torn pair of blue jeans, had been removed.

[11] Lugar, however, also asserted his Fifth Amendment right not to testify when asked whether the information contained in that signed statement was truthful.

[12] In establishing the above facts at trial, the State produced over sixty (60) witnesses and over two hundred (200) exhibits.

second-degree murder of Mrs. McLaughlin (*i.e.*, that (1) he killed Mrs. McLaughlin (2) with the specific intent to kill or inflict great bodily harm upon her).   The evidence placed petitioner in Baton Rouge at the time of Mrs. McLaughlin's disappearance and demonstrated that Mrs. McLaughlin never returned home on the day that, according to Johnson's testimony, she met with petitioner at the Quality Inn to discuss their marital situation.  The fact that petitioner drove Mrs. McLaughlin's Caprice Classic to Gonzales and to Benny's on the morning after Mrs. McLaughlin's disappearance (and his bill from the Quality Inn was found in that vehicle) also demonstrates contact between petitioner and Mrs. McLaughlin during the time in question.[13]  Petitioner's other suspicious behavior and activities in the days surrounding Mrs. McLaughlin's disappearance (*i.e.,* his checking into the Quality Inn (the closest motel to Mrs. McLaughlin's residence) and the Days Inn under false information; his unusual phone conversations with his sons wherein he would not reveal his location and indicated that their mother was in Mississippi purchasing a new car, which his sons knew to be false because of their mother's financial situation; the exorbitant

---

[13] Other evidence demonstrating contact between petitioner and Mrs. McLaughlin during the time period at issue includes petitioner's possession, at the time he was arrested by Brandon City Police, of an unendorsed income tax refund check that had been in Mrs. McLaughlin's possession prior to her disappearance as well as the fact that petitioner was in possession of $721.06 in cash at the time he was arrested.  The evidence presented at trial indicated that, when petitioner cashed his paycheck in Boone on or about June 10, 1998, he would have had $982.37 in cash.  The State demonstrated at trial that, over the course of June 10, 1998 until petitioner was arrested on June 16, 2008, petitioner spent over $550 in documented cash.  The State attributed the additional cash that petitioner had on his person at the time of his arrest to cash that was missing from Mrs. McLaughlin's brief case in her Caprice Classic.  Mrs. McLaughlin's employer, an orthodontist with Louisiana Orthodontics, testified that, at the time of her disappearance, Mrs. McLaughlin was in possession of certain cash belonging to Louisiana Orthodontics since she was the business manager responsible for depositing such cash on the entity's behalf.

number of phone calls placed to Mrs. McLaughlin from his work station in Boone in the days leading up to her disappearance; his request that the rented Lumina, including its trunk, be thoroughly cleaned, although it was not required by the rental company; the removal of the carpet from the rented Lumina's trunk and apparent cleaning of the trunk with Tide detergent; his misrepresentation to his barber that he was going on a boat trip with his brother; the fact, that in the days following Mrs. McLaughlin's disappearance, petitioner never once contacted his sons to find out if their mother had returned home and to check on them and offer to provide for them, etc.) also lead to the inference that he was involved in her disappearance/murder.   Furthermore, evidence of the couple's marital problems; Mrs. McLaughlin's decision to file for divorce and for a restraining order; her refusal to reconcile with petitioner; testimony that, during a fight earlier in the year of Mrs. McLaughlin's murder, petitioner had used the word "kill" when his wife mentioned divorcing him; and petitioner's statement to Johnson that "if he couldn't have [Mrs. McLaughlin] no one else would," demonstrated that petitioner had the motive and specific intent to kill her.

The additional evidence indicating that petitioner was highly familiar with the remote area of the Homochitto National Forest where his wife's remains were found and the conclusion of Dr. Suarez that the condition of Mrs. McLaughlin's body at the time he examined her was consistent with death by suffocation further suggest that the testimony of Johnson as to petitioner's confession was accurate since Johnson testified that petitioner told him he smothered Mrs. McLaughlin and then hid her body where it would never be found.   Since petitioner did not testify on his own behalf or present any alibi evidence to refute the evidence introduced by the State, the jury was left with the decision of whether or not to believe Johnson and the other witnesses who testified at trial.   The jury obviously

17

found Johnson and the other witnesses sufficiently credible to convict petitioner of second degree murder.  Such credibility determinations are entitled to great deference and are presumed correct.  *State v. Bates*, 683 So.2d 1370 (La. App. 1st Cir. 1996).  Since petitioner has failed to offer any new facts or evidence to rebut that presumption by clear and convincing evidence, the Court finds no reason to grant petitioner habeas relief relative to his sufficiency of the evidence claim.

The Court also finds that, although petitioner contends that his second degree murder conviction should be reduced to a manslaughter conviction, there was not sufficient evidence presented at trial to demonstrate that Mrs. McLaughlin's killing occurred in "sudden passion or heat of blood" as a result of provocative actions on Mrs. McLaughlin's part, such that a manslaughter conviction should have been rendered.  Manslaughter is defined, in relevant part, in La. R.S. 14:31(A) as:

> (1)   A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La. R.S. 14:31(A).  Proof of "sudden passion" and "heat of blood" are not elements of the offense but, instead, are factors in the nature of mitigating circumstances that may reduce the grade of homicide.  Furthermore, provocation is a question of fact to be determined by the trier of fact.  *State v. Crochet*, 96-1666 (La. App. 1 Cir. 1997), 693 So.2d 1300, 1307.  Thus, the issue concerning whether petitioner's conviction should be reduced to

manslaughter is whether a reasonable juror, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were established by a preponderance of the evidence.  *State v. Riley*, 91-2132 (La. App. 1 Cir. 5/20/94), 637 So.2d 758, 763, citing *State v. Lombard*, 486 So.2d 106, 111 (La. 1986).

In support of his argument that his conviction should have been reduced to manslaughter, petitioner relies solely upon the testimony of Johnson concerning the fact that, at the time Mrs. McLaughlin was killed, petitioner and Mrs. McLaughlin were involved in an argument concerning their divorce.  Petitioner contends such testimony proves that the offense was committed in "sudden passion" or "heat of blood."  However, he did not submit any independent evidence indicating that Mrs. McLaughlin's actions in the time period immediately preceding her death provoked him to such a degree that an average person would lose self-control and reflection and commit murder.  Furthermore, the jury was made fully aware, through Johnson's testimony, that petitioner and his wife were involved in a fight concerning their divorce at the time she was killed and obviously concluded that such argument, and Mrs. McLaughlin's concomitant refusal to reconcile with petitioner, were not sufficient mitigating circumstances to reduce the grade of homicide with which petitioner was convicted to manslaughter.[14]  Additionally, the circumstances surrounding Mrs. McLaughlin's murder suggest that petitioner acted with deliberation and forethought in killing Mrs. McLaughlin, hiding her body in a remote place, and thoroughly cleaning his rented vehicle and removing the carpet from the trunk in an effort at

---

[14] *See, State v. Chelette*, 453 So.2d 1282, 1286 (La. App. 3 Cir. 1984)(Evidence that a defendant and victim were in an argument prior to the killing is insufficient to support a finding of provocation).

concealing/destroying evidence as to his involvement in her murder.  The fact that Mrs. McLaughlin had filed for divorce and a temporary restraining order against petitioner on May 13, 1998, approximately one (1) month before she disappeared and that, according to Johnson's testimony, petitioner bragged to him about having committed the "perfect murder" and discussed the murder "like he enjoyed what he did" further suggests that Mrs. McLaughlin's murder was deliberate and planned and was not spontaneously provoked by Mrs. McLaughlin's discussion of divorce on June 11, 1998.  Considering the lack of evidence presented at trial demonstrating provocation as required by La. R.S. 14:31(A), the Court agrees with the First Circuit's conclusion on appeal that a reasonable juror could have found that the mitigating factors required to reduce petitioner's conviction to manslaughter were not established by a preponderance of the evidence at petitioner's trial.

In sum, the Court finds that the First Circuit's affirmation of petitioner's conviction for second degree murder, on the ground that the evidence presented at trial was sufficient to support such conviction, was not contrary to, or an unreasonable application, of the standard set forth in *Jackson* and did not result from an unreasonable determination of the facts in light of the evidence presented at petitioner's trial.  Accordingly, petitioner's second claim asserting insufficiency of the evidence should be dismissed with prejudice.

**III.   Ineffective Assistance of Counsel claim:**

A habeas petitioner seeking to prove ineffective assistance of counsel must meet the two-pronged burden of proof set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The petitioner must affirmatively demonstrate:

> (1)    that his counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and

(2)     that the deficient performance "prejudiced" his defense, *i.e.*, that
counsel's errors were so serious as to deprive the defendant of a fair
trial, a trial where the result is reliable.

*Strickland*, 104 S.Ct. at 2064.

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must

demonstrate that his counsel's representation fell below an objective standard of

reasonableness as measured by prevailing professional standards.   *Martin v. McCotter*,

796 F.2d 813, 816 (5th Cir. 1986), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d

985 (1987).  The reviewing court must indulge a strong presumption that counsel's conduct

fell within the wide range of reasonable professional competence and that, under the

circumstances, the challenged action might be considered sound trial strategy.  See *Bridge*

*v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).  The court, therefore, must make every

effort to eliminate the distorting effects of hindsight and to evaluate the conduct from

counsel's perspective at the time of trial.  *Martin*, 796 F.2d at 817.  Great deference is given

to counsel's exercise of his professional judgment.  *Bridge*, 838 F.2d at 773; *Martin*, 796

F.2d at 816.  When it is apparent that the alleged incompetent acts of the attorney were in

fact conscious strategic or tactical trial decisions, review of the acts must be "highly

deferential."  *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 2587 91 L.Ed.2d 305

(1986).  Mere error by counsel, even if professionally unreasonable, does not warrant

setting aside the judgment of a criminal proceeding if the error has no effect on the

judgment.  *Strickland*, 104 S. Ct. at 2066.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless

must also affirmatively demonstrate prejudice from the alleged errors.  *Earvin v. Lynaugh*,

860 F.2d 623, 627 (5th Cir. 1988).  To satisfy the prejudice prong of the *Strickland* test, it

is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.   *Strickland*, 104 S. Ct. at 2067.   To prove prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,104 S.Ct. at 2068.   A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*  The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." *Martin*, 796 F.2d at 816-17.  A conscious and informed tactical decision cannot be the basis for constitutionally ineffective assistance of counsel unless it is "so ill-chosen that it permeates the entire trial with obvious unfairness."   *Garland v. Maggio*, 717 F. 2d 199, 206 (5th Cir. 1982).

### (A)    Failure to file a motion to quash the indictment:

In this claim, petitioner contends that he was arrested and indicted for second degree murder based upon the perjured statements of three inmates, Charles Smith, Barry Lugar, and John Land, and that Assistant District Attorney, Premila Burns ("Ms. Burns"), was aware of such perjured statements and allowed testimony regarding such statements to be introduced during the grand jury proceedings.  Petitioner contends that his counsel was ineffective in failing to file a motion to quash the indictment on the ground of prosecutorial misconduct.

In reviewing this claim at the state level, the trial court concluded that it should be denied because the jurisprudence demonstrates that, even if defense counsel had filed a motion to quash the grand jury indictment on the ground that it was obtained through the

use of perjured testimony, he would not have prevailed.  As support for that conclusion, the

trial court cited several U.S. Supreme Court and Louisiana Supreme Court cases.  This

Court finds that at least two of those cases, *U.S. v. Mechanick*, 475 U.S. 66, 106 S.Ct. 938,

89 L.Ed.2d 50 (1986) and *State v. Walker*, 567 So.2d 581 (La. 1990), support the trial

court's conclusion.  In *Mechanick*, the U.S. Supreme Court concluded that a petit jury's

guilty verdict establishes probable cause to charge a defendant and thereby renders

harmless any errors that flow from violations of the procedural rules relating to grand jury

proceedings because the societal costs of retrial are far too substantial to justify setting

aside a verdict simply because of an error in the grand jury proceeding.  In *Walker*, the

Louisiana Supreme Court held that the drastic remedy of quashing an indictment was not

appropriate for nonmalicious, preindictment conduct of an assistant district attorney in

obtaining statements from the defendant regarding a related grand jury investigation,

without notifying defense counsel of the interview.  In reaching that conclusion in *Walker*,

the Louisiana Supreme Court explained that generally "a [d]efendant does not have a

constitutional right to challenge an indictment by asserting the illegality of the evidence that

was presented to the grand jury."  It is only when the alleged "misconduct clearly produced

the evidence resulting in the indictment" and "occurred before the grand jury itself,"

resulting in obvious prejudice, that quashing the indictment is appropriate.  *Id.*, at 586.

Despite petitioner's allegation that Ms. Burns knowingly presented the perjured

statements of Smith, Lugar and Land to the grand jury, the record actually indicates that

the prosecution did not call such individuals to testify before the grand jury or at trial.  Even

assuming their alleged perjured statements were divulged by the only witness who testified

during the grand jury proceedings, Officer Shane Evans, there was apparently other non-

tainted evidence presented during those proceedings that was sufficient to indict petitioner. Additionally, other evidence in the record, such as unsolicited correspondence that Charles Smith sent to the District Attorney's Office regarding the alleged false testimony of himself, Lugar, and Land, indicates that Ms. Burns did not know of any alleged wrongdoing or false statements by those individuals at the time of the grand jury proceedings.

Considering such evidence, the fact that petitioner has only asserted vague allegations of misconduct on the part of Ms. Burns,[15] and the fact that Smith, Lugar, and Land did not even testify during the grand jury proceedings, the Court agrees with the trial court's conclusion that, even if petitioner's counsel had filed a motion to quash the indictment, he likely would not have prevailed because he would not have been able to demonstrate "actual prejudice" to the accused.[16] [17]   In his state post-conviction relief

---

[15] In order for due process considerations to warrant the opening of grand jury proceedings (which are ordinarily subject to a veil of secrecy) to limited scrutiny, there must be specific allegations and proof to support a finding that the prosecutor intentionally or knowingly presented false testimony in an effort at obtaining an indictment. *U.S. v. Dunn,* 2005 WL 1705303 (S.D.N.Y. 2005)("Allegations based on belief, such as the Defendants' allegations here, provide no reason to disregard the presumption of regularity of grand jury proceedings, and do not even warrant an in camera review of the grand jury minutes"); *U.S. v. Teyibo,* 877 F.Supp. 846 (S.D.N.Y. 1995)(Grand jury proceedings are accorded a presumption of regularity, and inspection of minutes is rarely permitted absent specific allegations of prosecutorial misconduct, which must be more than mere conclusory assertions or speculation; thus, disclosure of grand jury minutes must be denied in all but extraordinary circumstances).  Petitioner's vague allegations of misconduct (which primarily relate to acts of misconduct committed by Sheriff's personnel, rather than Ms. Burns) do not meet that standard and would not have served as a meritorious basis for a motion to quash the indictment, had his attorney filed such a motion.

[16] *See, U.S. v. McKenzie*, 678 F.2d 629 (5th Cir. 1982)(Even in a case of the most egregious prosecutorial misconduct, an indictment may be dismissed only upon a showing of actual prejudice to the accused.  Thus, an indictment will only be quashed when prosecutorial misconduct amounts to "overbearing the will of the grand jury so that the indictment is, in effect, that of the prosecutor rather than the grand jury."  If

briefing, petitioner conceded that Ms. Burns may not have had knowledge of the alleged

perjured testimony until after the indictment was rendered.  Given her probable lack of

knowledge and the fact that Smith, Lugar, and Land were not called as witnesses during

the grand jury proceedings, the Court cannot find that the alleged prosecutorial misconduct

was so overbearing upon the will of the jury that it, in effect, made the indictment that of the

prosecutor rather than that of the grand jury, and it is unlikely that any prejudice that may

have occurred during the grand jury proceedings, as a result of the alleged perjured

statements being divulged through the testimony of Officer Evans, so tainted the petit jury

verdict as to warrant its reversal.  Finally, the societal costs of retrying petitioner at this

juncture are far too substantial to set aside his verdict based solely upon vague allegations

of prosecutorial misconduct during the grand jury proceedings, when overwhelming

evidence of petitioner's guilt (aside from any alleged statements made by Smith, Lugar, and

Land) was presented at trial.  Since attorneys are not required to file motions that they

deem to be futile and unmeritorious, petitioner's counsel was not ineffective for failing to

---

prosecutorial misconduct results in anything less, the defendant has adequate
safeguards during the trial to protect against his conviction by a petit jury); *James v.
U.S.*, 2008 WL 2782826 (N.D. Ill. 2008)(holding that a petitioner's ineffective assistance
of counsel claim failed *Strickland*'s prejudice prong because the motion to quash the
indictment on the grounds that it was based on perjured testimony did not have a
"reasonable probability of succeeding").

[17] Applying the Louisiana Supreme Court's standard in *Walker*, there is no clear
evidence in this case that the alleged perjured statements were the basis for the
indictment and that the prosecutor was actually aware of the falsity of such statements
and intentionally presented them to the grand jury, such that "obvious prejudice" exists.

file a motion to quash the indictment on grounds of prosecutorial misconduct.[18]  As such, this claim should be dismissed.

**(B)    Failure to investigate case, cross-examine witnesses, and call witnesses to testify:**

The Court has reviewed the record in this matter and finds that petitioner's trial counsel, Mary Roper and Randy Ligh, served him competently.[19]  Subsequent to petitioner's arrest and prior to his trial, petitioner's counsel filed numerous motions on his behalf, including a Motion for Bond Reduction, a Motion for Bill of Particulars, a Motion to Suppress Any and All Physical Evidence and Any and All Statements and/or Confessions, a Motion for Discovery and Disclosure, a Motion for Preliminary Examination, a Motion to Suppress Statements and Physical Evidence, an Objection and Response to the State's December 7, 1999 and December 14, 1999 Answer to Defendant's Motion for Discovery and Disclosure, a Motion to Quash Indictment on the Basis of Improper Venue, several motions for appointment of an investigator and for funds for same, a Notice of Alibi Defense and Motion for Disclosure, a Motion for Judicial Recusal, and a Motion in Limine. Petitioner's counsel also applied for writs to the First Circuit Court of Appeals when the

---

[18] Considering that La. C.Cr.P. art. 442 states, in part, that "no indictment shall be quashed or conviction reversed on the ground that the indictment was based, in whole or in part, on illegal evidence, or on the ground that the grand jury has violated a provision of this article" and the fact that the Louisiana Supreme Court held, in *State v. Robinson*, 423 So.2d 1053 (La. 1982), that alleged perjury testimony during grand jury proceedings was not a meritorious reason for quashing the indictment, defense counsel's decision not to file a motion to quash the indictment on the basis of alleged prosecutorial misconduct and perjured testimony was reasonable.

[19] The trial court initially appointed defense attorney, Bill Hecker to represent petitioner; however, Mr. Hecker was relieved of that duty on September 22, 1999, at which time Ms. Roper and Mr. Ligh were appointed as defense counsel.

state trial court ruled adversely to petitioner on certain of the above motions.  They subpoenaed various witnesses while investigating the case and for pre-trial hearings and trial.  At trial, petitioner's counsel both cross-examined the witnesses presented by the prosecution and presented eight (8) witnesses and three (3) exhibits on petitioner's behalf. Following trial, they filed a Motion for Article 821 Post Verdict Judgment of Acquittal or Alternatively for Article 851 New Trial.

Considering defense counsel's active representation of petitioner during both the pre-trial and trial phases of the case and the fact that counsel's decisions as to which witnesses to present on petitioner's behalf were strategic and are therefore owed great deference, the Court finds that defense counsel's representation of petitioner was not deficient.  Moreover, petitioner has not referred to any specific examples of how his counsel failed to investigate, failed to cross-examine State witnesses, or failed to call particular defense witness, and he has not explained how, as a result of such conduct, he was prejudiced such that the result of his trial would have been different had such errors and omissions not occurred.  Considering the overwhelming evidence of petitioner's guilt presented by the State at trial, counsel's strategic decision not to cross-examine or call a particular witness likely would not have changed the jury's verdict.  Thus, because petitioner has neither proven that his counsel was deficient nor that he was prejudiced by his counsel's alleged deficient conduct, his second claim of ineffective assistance of counsel should also be dismissed with prejudice.

## RECOMMENDATION

For the above reasons, it is recommended that the Petition for Writ of Habeas Corpus (R. Doc. 1) filed by petitioner, Roy H. McLaughlin, Jr., be **DISMISSED WITH PREJUDICE**.

Signed in chambers in Baton Rouge, Louisiana, March 9, 2009.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**

28